William B. DeClercq, SBN 240538
**TAYLOR ENGLISH DUMA LLP**
1055 West Seventh Street, Suite 3300
Los Angeles, CA 90017
Tel: (626) 408-2150
wdeclercq@taylorenglish.com

Coby S. Nixon (*pro hac vice* application forthcoming)
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA  30339
Telephone: (770) 434-6868
Facsimile: (770) 434-7376
cnixon@taylorenglish.com

*Counsel for Plaintiff*
*Rea.deeming Beauty Inc. d/b/a beautyblender*

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| REA.DEEMING BEAUTY INC.<br>d/b/a BEAUTYBLENDER, a<br>California Corporation,<br><br>Plaintiff,<br><br>v.<br><br>NEW FLAG GMBH, a German<br>limited liability company,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1)  BREACH OF CONTRACT;**<br>**(2)  BREACH OF THE**<br>**       COVENANT OF GOOD**<br>**       FAITH AND FAIR DEALING;**<br>**(3)  CONTRIBUTORY FEDERAL**<br>**       TRADEMARK**<br>**       INFRINGEMENT; AND**<br>**(4)  CONTRIBUTORY FEDERAL**<br>**       UNFAIR COMPETITION**<br>**       AND FALSE DESIGNATION**<br>**       OF ORIGIN.**<br><br>**DEMAND FOR JURY TRIAL** |

1
COMPLAINT

Plaintiff Rea.deeming Beauty Inc. d/b/a beautyblender ("Plaintiff" or "beautyblender") for its complaint against Defendant New Flag GmbH ("Defendant" or "New Flag") states as follows:

## THE NATURE OF THE ACTION

1. This is an action for damages and injunctive relief for breach of contract, breach of the covenant of good faith and fair dealing, contributory trademark infringement under Section 32 of the Federal Lanham Act, 15 U.S.C. § 1114, and contributory unfair competition and false designation of origin under Section 43(a) of the Federal Lanham Act, 15 U.S.C. §1125(a).

## THE PARTIES

2. Plaintiff Rea.deeming Beauty Inc. is a corporation organized and existing under the laws of the State of California with a principal place of business at 3864 Courtney Street, Suite 190, Bethlehem, Pennsylvania 18017.

3. Upon information and belief, Defendant New Flag GmbH is a German limited liability company with a principal place of business at Leopoldstraße 154, 80804 München, Germany.

## JURISDICTION AND VENUE

4. This action arises under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and under the common laws of the State of California.

5. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338 as to the claims under federal law and pursuant to 28 U.S.C. § 1367(a) as to the claims under state law.

6. In addition, subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(2). The matter is between a citizen of a State and a citizen of a foreign state and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over New Flag, and venue is proper in this district because, in Section 6.1 of the Distribution Agreement that is the subject of this litigation, New Flag irrevocably consented to jurisdiction and venue in Los Angeles County, California, and expressly waived any objection to improper jurisdiction, improper venue, or inconvenient forum in Los Angeles County, California.

8.      Venue is also proper pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### The BEAUTYBLENDER Brand and Intellectual Property

9.      Founded in 2003 by Rea Ann Silva, one of the most sought-after Hollywood makeup artists in the industry, Plaintiff beautyblender has forever changed the way makeup is applied.

10.      While working as head of the makeup department for one of the first television shows shot in high-definition, Ms. Silva grew frustrated with the existing tools for applying and touching up makeup and knew a better tool was needed to provide a flawless face, free of lines or demarcations.  After spending hours in her makeup trailer cutting up sponges to form the perfect elliptical shape, Ms. Silva created a one-of-a-kind edgeless makeup sponge that delivers a professional airbrush effect without actually using an airbrush:

1
2
3
4
5
6
7
8
9

 

10    11.    Introduced by Plaintiff as the BEAUTYBLENDER brand sponge, this category-creator product quickly won countless beauty awards and is now beloved by both makeup aficionados and newbies as the go-to tool for achieving a perfectly blended complexion. Today, beautyblender continues to drive innovation with products such as blenders, foundations, blending kits, and other beauty-related tools and accessories that require minimal effort yet offer maximum results.

12.    Plaintiff sells its products through its own website, beautyblender.com, and also through its network of authorized distributors and authorized online and in-store retailers (collectively, "Authorized Dealers").

13.    Plaintiff devotes a significant amount of time, energy, and resources toward protecting the value of its BEAUTYBLENDER brand, products, name, and reputation. By distributing products exclusively through its own website and its Authorized Dealers, beautyblender is able to ensure the satisfaction of consumers and maintain the integrity and reputation of the BEAUTYBLENDER brand. In the highly competitive beauty products market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

14.    The BEAUTYBLENDER brand's online presence is strong, not only on Plaintiff's own website, but on the various social media platforms through which it

engages with the public. Plaintiff's Instagram account has over 2.3 million followers. Its Facebook account has over 330,000 followers. Its Twitter account has over 100,000 followers.

15.   Plaintiff has used the BEAUTYBLENDER mark in commerce throughout the United States continuously since at least 2004 and has invested millions of dollars promoting its brand under the BEAUTYBLENDER mark (the "BEAUTYBLENDER Mark").

16.   Plaintiff owns numerous valid United States federal trademark registrations for its BEAUTYBLENDER Mark, including but are not limited to, the following:

| Trademark | Reg./Ser. No. | Description of Goods |
|---|---|---|
| BEAUTYBLENDER | 2,945,105 | Sponge applicator for makeup. |
| beautyblender | 4,719,164 | Non-medicated cleansers, namely, cleanser for cleaning cosmetic sponge applicators and make up brushes.<br><br>Cosmetic cases sold empty; Travel cases; Vanity cases sold empty; Pouches for holding makeup accessories sold empty; Makeup accessory carrying cases sold empty.<br><br>Sponge applicator for applying makeup; Sponges used for applying makeup; Sponge holders; Cosmetic storage kits including a palette empty of cosmetics used for color matching purposes and storage of customized cosmetic blends in a nonmetal storage container; Cosmetic blending sponge kits |

| Trademark | Reg./Ser. No. | Description of Goods |
|---|---|---|
| | | comprising sponges for applying makeup and sponge cleanser; Tools for skin care, namely, makeup brushes |
| beautyblender | 4,719,175 | Non-medicated cleansers, namely, cleanser for cleaning cosmetic sponge applicators and make up brushes.<br><br>Cosmetic cases sold empty; Travel cases; Vanity cases sold empty; Pouches for holding makeup accessories sold empty; Makeup accessory carrying cases sold empty.<br><br>Sponge applicator for applying makeup; Sponges used for applying makeup; Sponge holders; Cosmetic storage kits including a palette empty of cosmetics used for color matching purposes and storage of customized cosmetic blends in a nonmetal storage container; Cosmetic blending sponge kits comprising sponges for applying makeup and sponge cleanser; Tools for skin care, namely, cosmetic brushes |
| the original beautyblender | 4,719,170 | Non-medicated cleansers, namely, cleanser for cleaning cosmetic sponge applicators and make up brushes.<br><br>Cosmetic cases sold empty; Travel cases; Vanity cases sold empty; Pouches for holding makeup accessories sold empty; Makeup accessory carrying cases sold empty. |

6
COMPLAINT

| Trademark | Reg./Ser. No. | Description of Goods |
|---|---|---|
|  |  | Sponge applicator for applying makeup; Sponges used for applying makeup; Sponge holders; Cosmetic storage kits including a palette empty of cosmetics used for color matching purposes and storage of customized cosmetic blends in a nonmetal storage container; Cosmetic blending sponge kits comprising sponges for applying makeup and sponge cleanser; Tools for skin care, namely, cosmetic brushes. |

17.    Correct and true printouts of these federal trademark registrations from the USPTO trademark database are attached hereto as **Exhibit A**.

18.    U.S. Reg. No. 2,945,105 for the BEAUTYBLENDER Mark has become incontestable under 15 U.S.C. § 1065.

19.    As a result of its widespread, continuous and exclusive use of the BEAUTYBLENDER Mark to identify its goods and beautyblender as their source, beautyblender enjoys valid and subsisting federal and state common law rights to the BEAUTYBLENDER Mark.

20.    The goods beautyblender offers under the BEAUTYBLENDER Mark are of high quality.  Plaintiff devotes an enormous amount of resources to product development and quality control and to providing customer service to customers of its retail channels, all to ensure that the goods it offers are reflective of, and consistent with, its brand's prestige.

**Plaintiff's Strict Quality Controls**

21.     Recognizing the risks to consumers and the reputational damage caused by the unauthorized sale of non-genuine beautyblender products, beautyblender has implemented quality controls that apply to its products sold in both brick and mortar retail settings and online with the twin aims of protecting consumers and the value and goodwill associated with the BEAUTYBLENDER Mark.

22.     The goal of beautyblender's quality control program is to ensure that consumers who purchase beautyblender products receive products that feature all of the special characteristics that customers have come to expect from products sold under the BEAUTYBLENDER Mark – including the beautyblender warranty, quality, and reliability.

23.     The quality controls seek to minimize the likelihood that poor quality products will reach consumers. By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and defective products and also protects the value and goodwill associated with the BEAUTYBLENDER Mark.

24.     Plaintiff abides by its quality control requirements and requires its Authorized Dealers to abide by them as well.

25.     Plaintiff's ability to exercise its quality controls is essential to the integrity, quality, and prestige of beautyblender products, as well as the value of the BEAUTYBLENDER Mark and other intellectual property.

**Plaintiff's Limited Manufacturer's Warranty**

26.     Plaintiff provides a limited manufacturer's warranty (the "Warranty") for beautyblender products sold to end customers by beautyblender directly or by Authorized Dealers. The Warranty provides, for example, that if a beautyblender product is defective, the product may be returned within 30 days of purchase for a full refund or exchange.

27.     Plaintiff extends its Warranty only to products that were sold by sellers that were subject to beautyblender's quality controls and agreed to follow its quality controls. Because products sold by unauthorized sellers are not subject to beautyblender's quality controls and beautyblender can therefore not ensure the quality of such products, the Warranty is not available for beautyblender products sold by unauthorized sellers.

28.     Plaintiff's Warranty is a material element of genuine beautyblender products. Consumers purchasing beautyblender products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by beautyblender's Warranty.

**Plaintiff's Network of Authorized Dealers**

29.     Plaintiff maintains its strict quality control over beautyblender products by selling its products exclusively to customers directly or to Authorized Dealers.

30.     Plaintiff exercises great care in selecting the Authorized Dealers, and permits Authorized Dealers to sell beautyblender products in specific territories only. Plaintiff requires Authorized Dealers to abide by applicable beautyblender policies and rules relating to quality controls, customer service, and other sales practices.

31.     For example, Authorized Dealers are obligated to promptly respond to all inquiries from customers and to permit beautyblender to inspect their inventories, service records, sales records, and other relevant documents.

32.     To avoid consumer confusion and ensure that customers receive genuine beautyblender products, Authorized Dealers are prohibited from removing or altering any trade names, trademarks, notices, serial numbers, labels, tags, or other identifying marks, symbols, or legends affixed to any beautyblender products or containers or packages without prior written consent of beautyblender.

33.     Authorized Dealers are also obligated to ensure that beautyblender products comply with all labeling and other legal requirements in a dealer's territory.

And Authorized Dealers are prohibited from directly shipping beautyblender products outside of a dealer's territory or knowingly permitting such activity to be conducted by any entity.

34.    To allow it to detect counterfeit products, beautyblender places barcodes on many of its products. Plaintiff's barcodes allow it to keep track of which specific products have been sold to a specific Authorized Dealer and alert Authorized Dealers if specific products ever need to be recalled or receive other attention. The barcodes also allow beautyblender to determine which Authorized Dealer a specific product was sold to when a customer complains of poor quality and returns the product with the barcode.

35.    The purposes of these obligations, restrictions, and practices are to ensure the integrity, quality, and prestige of beautyblender products, and to ensure that beautyblender knows who its Authorized Dealers are, which ones are selling in a given territory, and how to immediately contact them in the event of any product quality issues.

36.    Plaintiff's quality control requirements and network of Authorized Dealers are legitimate, substantial, and non-pretextual and have been implemented so that beautyblender can control the quality of goods manufactured and sold under the BEAUTYBLENDER Mark, which protects consumers and the value and goodwill associated with the BEAUTYBLENDER Mark.

37.    Plaintiff's quality control requirements are also material because they are designed to protect consumers and prevent them from receiving poor quality products that could deceive them or cause harm to beautyblender's reputation and goodwill.

38.    Consumers consider it material and relevant to their purchasing decision to know whether a beautyblender product is being sold by an Authorized Dealer that is subject to beautyblender's quality control requirements or whether it is being sold

by an unauthorized seller that is not subject to and does not abide by beautyblender's quality controls and over whom beautyblender is unable to exercise its quality controls.

**Plaintiff's Relationship and Distribution Agreement with New Flag**

39.     New Flag has been an Authorized Dealer of beautyblender products in Germany, Austria, and Switzerland since about 2014.

40.     On January 1, 2018, Plaintiff entered into a new distribution agreement with New Flag (the "Distribution Agreement") and appointed New Flag as the distributor of beautyblender products in Germany, Austria, and Switzerland, as well as in the Czech Republic and Slovakia, (collectively, "the New Flag Territory"). A true and correct copy of the Distribution Agreement is attached as **Exhibit B**.

41.     Pursuant to the Distribution Agreement, New Flag agreed not to directly ship beautyblender products outside of the New Flag Territory or knowingly permit such activity to be conducted by any entity. New Flag also agreed not to actively advertise, promote or solicit customers for beautyblender products outside the New Flag Territory. In addition, New Flag agreed not to establish any office through which orders are solicited or any depot at which inventories of beautyblender products are stored outside the New Flag Territory.

42.     Pursuant to the Distribution Agreement, New Flag agreed that activities outside the New Flag Territory are considered a material breach of the Distribution Agreement.

43.     Pursuant to the Distribution Agreement, New Flag also covenanted and warranted that it would not engage in any action or activity that would result in the purposes of the Distribution Agreement or New Flag's obligations under the Distribution Agreement.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**The beautyblender Products Distributed by New Flag are
Intended for the New Flag Territory**

44.     Plaintiff manufactures its beautyblender products for many different countries, including the United States and the countries that make up the New Flag Territory.

45.     The beautyblender products supplied to New Flag for sale in the New Flag Territory are materially different from the beautyblender products sold by beautyblender and its Authorized Dealers in the United States.

46.     For example, the BEAUTYBLENDER brand sponge applicator is sold within a canister containing the sponge itself and a product insert with instructions on how to use and care for the product. For products intended for sale in the United States, the instructions on the product insert are in English.  By contrast, for products intended for sale in the New Flag Territory, the instructions are in German.

47.     As a result of such differences, the sale of beautyblender products intended for the New Flag Territory to end customers in the United States (e.g., resulting in a United States customer receiving a BEAUTYBLENDER brand sponge with a German-language insert) will cause confusion over the source of the products and result in a loss of beautyblender's goodwill.

48.     Upon information and belief, New Flag has known since at least 2014 that the beautyblender products supplied to New Flag for distribution are intended for sale in the New Flag Territory and outside the United States.

**New Flag's Breach of the Distribution Agreement**

49.     To ensure that Authorized Dealers adhere to beautyblender's quality control requirements and restrictions on authorized sales, beautyblender regularly monitors sales of its products.

COMPLAINT

50.   In the course of this monitoring, beautyblender discovered that products bearing the BEAUTYBLENDER Mark were being illegally sold in the United States in Costco retail stores and on www.costco.com.

51.   Costco, including Costco Wholesale Corporation and its subsidiaries, is not an Authorized Dealer of beautyblender products.

52.   Plaintiff also discovered that products bearing the BEAUTYBLENDER Mark were being illegally sold in the United States in T.J. Maxx retail stores and on www.tjmaxx.tjx.com.

53.   T.J. Maxx, including The TJX Companies, Inc. and its subsidiaries, is not an Authorized Dealer of beautyblender products.

54.   Plaintiff's investigation uncovered that the products bearing the BEAUTYBLENDER Mark being sold by T.J. Maxx were supplied by White Diamond Cosmetics, Ltd. of New Brunswick, New Jersey.

55.   White Diamond Cosmetics, Ltd., including any subsidiaries and anyone purporting to act on its behalf, is not an Authorized Dealer of beautyblender products.

56.   In about October, 2018, Plaintiff purchased sample products bearing the BEAUTYBLENDER Mark from Costco on www.costco.com. The products, such as applicator sponges, had been placed inside a plastic, clamshell packaging using an adhesive at the bottom of the outer canister containing the sponge. When Plaintiff removed the canister from the packaging, the barcode affixed to the bottom of the canister became torn and damaged, such that it was unreadable.

57.   Photographs showing a sample product in the clamshell packaging, the adhesive used in the packaging, and the damaged barcode on the bottom of the product canister, are reproduced below:

COMPLAINT

  

58.    Using the barcodes on other of the sample products purchased from Costco in the United States, beautyblender was able to determine that the products were originally supplied to New Flag for distribution in the New Flag Territory.

59.    In about April, 2019, Plaintiff purchased sample products bearing the BEAUTYBLENDER Mark from T.J. Maxx on www.tjmaxx.tjx.com. The products Plaintiff received were materially altered and had been subjected to tampering by having certain anti-counterfeiting measures removed. The products also contained German-language inserts.

60.    Using the barcodes on products purchased from T.J. Maxx in the United States, beautyblender was able to determine that the products were originally supplied to New Flag for distribution in the New Flag Territory.

61.    Upon information and belief, New Flag has and continues to actively and knowingly distribute, promote, offer for sale, and/or sell products bearing the BEAUTYBLENDER Mark to Costco, T.J. Maxx, White Diamond Cosmetics, Ltd., and other unauthorized dealers (the "Unauthorized Dealers") for importation into and sale within the United States (and outside the New Flag Territory).

62.    Such conduct constitutes, among other things, a material breach of the Distribution Agreement.

1
2

**New Flag's Distribution of Gray Market Goods and
Contributory Infringement of the BEAUTYBLENDER Mark**

3      63.    Because there are material differences between beautyblender products

4    sold in the United States by beautyblender and its Authorized Dealers, on the one

5    hand, and products bearing the BEAUTYBLENDER Mark sold in the United States

6    by the Unauthorized Dealers, on the other hand, the products sold by the

7    Unauthorized Dealers are not "genuine." Rather, they constitute illegal gray market

8    goods.

9      64.    For example, the products sold by the Unauthorized Dealers are

10   "materially different" because beautyblender is deprived of the means to control their

11   quality or to respond to customer complaints and negative reviews.

12     65.    In this regard, the Unauthorized Dealers do not comply with

13   beautyblender's quality control requirements because they have not disclosed to

14   beautyblender where they acquire products that bear the BEAUTYBLENDER Mark.

15     66.    Upon information and belief, the Unauthorized Dealers do not comply

16   with beautyblender's quality control requirements because they sell products bearing

17   the BEAUTYBLENDER Mark that arrive in packaging adhered to the product

18   barcode such that opening the product renders the barcode unreadable.

19     67.    Upon information and belief, the Unauthorized Dealers do not comply

20   with beautyblender's quality control requirements because they sell products bearing

21   the BEAUTYBLENDER Mark that have been materially altered and subjected to

22   tampering by having anti-counterfeiting measures removed.

23     68.    Upon information and belief, the Unauthorized Dealers do not comply

24   with beautyblender's quality control requirements because they sell products bearing

25   the BEAUTYBLENDER Mark that were intended for sale outside the United States

26   and contain foreign-language inserts.

27
28

69.     The Unauthorized Dealers' failure to abide by beautyblender's quality control requirements prevents beautyblender from exercising control over the quality of products the Unauthorized Dealers sell bearing the BEAUTYBLENDER Mark. Plaintiff cannot audit the Unauthorized Dealers to ensure they are complying with beautyblender's quality controls and/or close any Unauthorized Dealer account for failing to comply with beautyblender's quality control requirements.

70.     The Unauthorized Dealers also do not comply with beautyblender's customer service requirements because they are not qualified nor have they been trained by beautyblender to accurately describe, demonstrate, and sell the products in their inventory and advise customers on the safe and proper use and care of beautyblender products.

71.     The Unauthorized Dealers also do not comply with beautyblender's customer service requirements because they do not, and are unable to, provide the ongoing support and responses to consumer inquiries that beautyblender requires of its Authorized Dealers.

72.     The Unauthorized Dealers do not comply with beautyblender's customer service requirements because they do not take appropriate steps to address negative reviews from customers and do not cooperate with beautyblender in investigating negative product reviews.

73.     The products bearing the BEAUTYBLENDER Mark sold by the Unauthorized Dealers are also materially different from genuine beautyblender products because they are not covered by beautyblender's Warranty.

74.     On information and belief, New Flag has actual knowledge that the Unauthorized Dealers are not Authorized Dealers of beautyblender products and do not comply with beautyblender's quality control and customer service requirements.

75.    On information and belief, New Flag has actual knowledge that the products bearing the BEAUTYBLENDER Mark sold by the Unauthorized Dealers are not covered by beautyblender's Warranty.

76.    On information and belief, New Flag has actual knowledge that it is distributing products bearing the BEAUTYBLENDER Mark to Unauthorized Dealers that are importing and selling the products in the United States.

77.    On information and belief, New Flag has actual knowledge that it is distributing gray market goods.

78.    New Flag's unauthorized distribution of gray market goods bearing the BEAUTYBLENDER Mark is likely to, and does, create customer confusion because customers who purchase products from the Unauthorized Dealers in the United States believe they are purchasing genuine beautyblender products when, in fact, they are not.

79.    Despite these facts, New Flag has sold, and continues to sell, products bearing the BEAUTYBLENDER Mark to Unauthorized Dealers with knowledge that the Unauthorized Dealers are engaging in infringement of the BEAUTYBLENDER Mark.

80.    Such conduct constitutes, among other things, contributory trademark infringement.

**Plaintiff's Suffering of Significant Harm**

81.    As set forth above, the unauthorized sale of products bearing the BEAUTYBLENDER Mark through the Unauthorized Dealers has caused significant harm to the BEAUTYBLENDER brand.

82.    When a consumer receives a poor quality, defective, counterfeit, or tampered-with product from an Unauthorized Dealer, the consumer associates that negative experience with beautyblender. As a result, the ongoing sale of unauthorized

products bearing the BEAUTYBLENDER Mark harms the BEAUTYBLENDER brand.

83.   Plaintiff has suffered and will continue to suffer significant monetary harm as a result of New Flag's actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

84.   Plaintiff has suffered, and will continue to suffer, irreparable harm as a result of New Flag's actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights and brand integrity.

85.   Plaintiff is entitled to injunctive relief because, unless enjoined by this Court, New Flag will continue to unlawfully distribute products bearing the BEAUTYBLENDER Mark to Unauthorized Dealers for importation and sale in the United States, causing continued irreparable harm to beautyblender's reputation, goodwill, relationships, intellectual property and brand integrity.

86.   New Flag's conduct was and is knowing, intentional, willful, malicious, wanton and contrary to law.

87.   New   Flag's   willful   contributory   infringement   of   the BEAUTYBLENDER Mark and continued pattern of misconduct demonstrate intent to harm beautyblender.

## FIRST CAUSE OF ACTION
### Breach of Contract – Distribution Agreement

88.   Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

89.   New Flag entered into the Distribution Agreement with beautyblender whereby New Flag agreed, e.g., (i) not to directly ship beautyblender products outside of the New Flag Territory or knowingly permit such activity to be conducted by any

entity; (ii) not to actively advertise, promote or solicit customers for beautyblender products outside the New Flag Territory; and (iii) not to establish any office through which orders are solicited or any depot at which inventories of beautyblender products are stored outside the New Flag Territory.

90.     New Flag agreed that activities outside the New Flag Territory are considered a material breach of the Distribution Agreement.

91.     New Flag also covenanted and warranted that it would not engage in any action or activity that would result in the purposes of the Distribution Agreement or New Flag's obligations under the Distribution Agreement.

92.     As set forth more fully above, New Flag materially breached the Distribution Agreement by directly shipping products bearing the BEAUTYBLENDER Mark to Costco, T.J. Maxx, White Diamond Cosmetics, Ltd., and other Unauthorized Dealers outside the New Flag Territory, and/or knowingly permitting such activity by the Unauthorized Dealers.

93.     As set forth more fully above, New Flag has also breached the Distribution Agreement by actively advertising, promoting or soliciting Unauthorized Dealers for beautyblender products outside the New Flag Territory.

94.     Plaintiff has honored and complied with all of its obligations with respect to the Distribution Agreement.

95.     Plaintiff has been damaged by reason of the breaches of contract by New Flag and is entitled to monetary relief in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

96.     Plaintiff suffered and continues to suffer irreparable harm not fully compensable by monetary damages.

97.     Plaintiff is entitled to injunctive relief enjoining New Flag from distributing beautyblender products outside the New Flag Territory.

## SECOND CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

98.   Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

99.   New Flag entered into the Distribution Agreement with beautyblender whereby New Flag agreed, e.g., (i) not to directly ship beautyblender products outside of the New Flag Territory or knowingly permit such activity to be conducted by any entity; (ii) not to actively advertise, promote or solicit customers for beautyblender products outside the New Flag Territory; and (iii) not to establish any office through which orders are solicited or any depot at which inventories of beautyblender products are stored outside the New Flag Territory.

100.   By reason of the Distribution Agreement, New Flag covenanted and agreed to perform its obligations fairly and in good faith including, but not limited to, an obligation to not distribute beautyblender products outside of the New Flag Territory.

101.   As set forth more fully above, New Flag breached its covenant of good faith and fair dealing by intentionally distributing, and attempting to distribute, beautyblender products to Unauthorized Dealers outside of the New Flag Territory and by failing to accurately disclose such activities to beautyblender.

102.   Plaintiff has been damaged by reason of the breaches by New Flag and is entitled to monetary relief in an amount to be determined at trial, plus interest, costs, and attorneys' fees.

## THIRD CAUSE OF ACTION
### Contributory Trademark Infringement Under Section 32 of the Federal Lanham Act, 15 U.S.C. § 1114

103.   Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

104.   Plaintiff owns valid and enforceable federal trademark registrations for the BEAUTYBLENDER Mark. *See* Exhibit A.

105.   The Unauthorized Dealers' use of the BEAUTYBLENDER Mark within the United States on products that are materially different from Plaintiff's genuine products has caused or is likely to continue to cause confusion, to cause mistake, or to deceive.

106.   Upon information and belief, New Flag had and continues to have actual knowledge of the infringing conduct of the Unauthorized Dealers, and has aided, encouraged, and facilitated such conduct.

107.   Upon information and belief, New Flag has continued to supply products bearing the BEAUTYBLENDER Mark to the Unauthorized Dealers even after it knew that the Unauthorized Dealers were engaging in trademark infringement.

108.   As a direct and proximate result of New Flag's contributory trademark infringement, Plaintiff has suffered damages in an amount to be determined at trial.

109.   Pursuant to Section 34 of the Lanham Act, 15 U.S.C. § 1116, Plaintiff is entitled to injunctive relief to prevent damage to Plaintiff and to prohibit New Flag from further violations of the Lanham Act.

110.   Furthermore, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), Plaintiff is entitled to monetary damages, New Flag's profits, costs, and prejudgment interest.

111.   This is an exceptional case under Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), entitling Plaintiff to recover its attorneys' fees and up to three times its actual damages.

## THIRD CAUSE OF ACTION
**Contributory Unfair Competition and False Designation of Origin Under Section 43(a) of the Federal Lanham Act, 15 U.S.C. §1125(a)**

112.   Plaintiff hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

113.   Through exclusive use of the BEAUTYBLENDER Mark for nearly fifteen years, Plaintiff has developed extensive goodwill in the Mark, which goodwill is protected by, *inter alia*, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

114.   By the actions alleged above with respect to the importation and sales in the United States of BEAUTYBLENDER-branded products intended for the New Flag Territory, the Unauthorized Dealers have used in commerce a word, term, symbol or device that is a false designation of origin or a false or misleading description of fact.

115.   The Unauthorized Dealers' promotion, advertising, and sales of "gray market" products bearing the BEAUTYBLENDER Mark have caused and are likely to continue to cause confusion, mistake or deception as to the origin, sponsorship or approval of the products such that consumers mistakenly believe they are purchasing genuine beautyblender products.

116.   The Unauthorized Dealers' promotion, advertising, and sales of "gray market" products bearing the BEAUTYBLENDER Mark constitute false designation of origin in violation of Section 43(a)(1)(A) of the Lanham Act, as amended, 15 U.S.C. § 1125(a)(1)(A).

117.   Upon information and belief, New Flag had and continues to have actual knowledge of the infringing conduct of the Unauthorized Dealers, and has aided, encouraged, and facilitated such conduct.

118.   Upon information and belief, New Flag has continued to supply products bearing the BEAUTYBLENDER Mark to the Unauthorized Dealers even after it knew that the Unauthorized Dealers were engaging in unfair competition and false designation of origin.

119.   As a direct and proximate result of New Flag's contributory unfair competition and false designation of origin, Plaintiff has suffered damages in an amount to be determined at trial.

120.   Pursuant to Section 34 of the Lanham Act, 15 U.S.C. § 1116, Plaintiff is entitled to injunctive relief to prevent damage to Plaintiff and to prohibit New Flag from further violations of the Lanham Act.

121.   Furthermore, pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), Plaintiff is entitled to monetary damages, New Flag's profits, costs, and prejudgment interest.

122.   This is an exceptional case under Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), entitling Plaintiff to recover its attorneys' fees and up to three times its actual damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court order the following relief:

a.   A judgment entered in favor of Plaintiff on the counts asserted herein;

b.   An injunction enjoining Defendant and its employees, agents, representatives, distributors, dealers, related companies and d/b/a's, and all persons in active concert or participation with any of them, from distributing products bearing the BEAUTYBLENDER Mark outside the New Flag Territory;

c.   An injunction enjoining Defendant and its employees, agents, representatives, distributors, dealers, related companies and d/b/a's, and all persons in active concert or participation with any of them, from aiding, encouraging, or facilitating in the importation, marketing, offering for sale, selling, advertising, promoting, or distributing any "gray market" beautyblender products in the United States;

d.    An order requiring the impounding and eventual destruction of infringing goods distributed by Defendant;

e.    An order requiring delivery to Plaintiff of Defendant's records documenting the purchase, acquisition, receipt, importation, manufacture, sale, servicing or distribution of things involved in violations alleged herein;

f.    Damages, exemplary damages, and disgorgement of profits in an amount to be proven at trial;

g.    A declaration that this is an exceptional case;

h.    Full costs, attorneys' fees, and pre- and post-judgment interest to the full extent permissible by law; and

i.    Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: May 22, 2019

William B. DeClercq, SBN 240538
**TAYLOR ENGLISH DUMA LLP**
1055 West Seventh Street, Suite 3300
Los Angeles, CA 90017
Telephone: (626) 408-2150
wdeclercq@taylorenglish.com

Coby S. Nixon (*pro hac vice* application forthcoming)
**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA  30339

24
COMPLAINT

1
Telephone: (770) 434-6868
Facsimile: (770) 434-7376
2
cnixon@taylorenglish.com
3

4
*Counsel for Plaintiff*
*Rea.deeming Beauty Inc. d/b/a beautyblender*
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT A

Int. Cl.: 21

Prior U.S. Cls.: 2, 13, 23, 29, 30, 33, 40, and 50

**Reg. No. 2,945,105**

## United States Patent and Trademark Office

Registered Apr. 26, 2005

## TRADEMARK
### PRINCIPAL REGISTER

## BEAUTYBLENDER

SILENZ BEAUTY, INC. (CALIFORNIA COR-
PORATION)
899 SOUTH RAINBOW BLVD.
SUITE 612
LAS VEGAS, NV 89145

FOR: SPONGE APPLICATOR FOR MAKEUP, IN
CLASS 21 (U.S. CLS. 2, 13, 23, 29, 30, 33, 40 AND 50).

FIRST USE 7-1-2004; IN COMMERCE 7-1-2004.

SN 78-267,224, FILED 6-26-2003.

NICHOLAS ALTREE, EXAMINING ATTORNEY

# United States of America

## United States Patent and Trademark Office

# beautyblender

**Reg. No. 4,719,164**

**Registered Apr. 14, 2015**

**Int. Cls.: 3, 18 and 21**

**TRADEMARK**

**PRINCIPAL REGISTER**

REA.DEEMING BEAUTY, INC. (CALIFORNIA CORPORATION), DBA BEAUTYBLENDER
SUITE 280
3864 COURTNEY STREET
BETHLEHEM, PA 18017

FOR: NON-MEDICATED CLEANSERS, NAMELY, CLEANSER FOR CLEANING COSMETIC
SPONGE APPLICATORS AND MAKE UP BRUSHES, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51
AND 52).

FIRST USE 7-1-2005; IN COMMERCE 7-1-2005.

FOR: COSMETIC CASES SOLD EMPTY; TRAVEL CASES; VANITY CASES SOLD EMPTY;
POUCHES FOR HOLDING MAKEUP ACCESSORIES SOLD EMPTY; MAKEUP ACCESSORY
CARRYING CASES SOLD EMPTY, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).

FIRST USE 1-1-2012; IN COMMERCE 1-1-2012.

FOR: SPONGE APPLICATOR FOR APPLYING MAKEUP; SPONGES USED FOR APPLYING
MAKEUP; SPONGE HOLDERS; COSMETIC STORAGE KITS INCLUDING A PALETTE
EMPTY OF COSMETICS USED FOR COLOR MATCHING PURPOSES AND STORAGE OF
CUSTOMIZED COSMETIC BLENDS IN A NONMETAL STORAGE CONTAINER; COSMETIC
BLENDING SPONGE KITS COMPRISING SPONGES FOR APPLYING MAKEUP AND
SPONGE CLEANSER; TOOLS FOR SKIN CARE, NAMELY, MAKEUP BRUSHES, IN CLASS
21 (U.S. CLS. 2, 13, 23, 29, 30, 33, 40 AND 50).

FIRST USE 7-1-2004; IN COMMERCE 7-1-2004.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 2,945,105.

SER. NO. 86-238,817, FILED 4-1-2014.

MARK SPARACINO, EXAMINING ATTORNEY



*Michelle K. Lee*

Director of the United States
Patent and Trademark Office

# United States of America
## United States Patent and Trademark Office

# beautyblender

**Reg. No. 4,719,175**
**Registered Apr. 14, 2015**
**Int. Cls.: 3, 18 and 21**

**TRADEMARK**

**PRINCIPAL REGISTER**



Director of the United States
Patent and Trademark Office

REA.DEEMING BEAUTY, INC. (CALIFORNIA CORPORATION), DBA BEAUTYBLENDER
SUITE 280
3864 COURTNEY STREET
BETHLEHEM, PA 18017

FOR: NON-MEDICATED CLEANSERS, NAMELY, CLEANSER FOR CLEANING COSMETIC SPONGE APPLICATORS AND MAKE UP BRUSHES, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 7-1-2005; IN COMMERCE 7-1-2005.

FOR: COSMETIC CASES SOLD EMPTY; TRAVEL CASES; VANITY CASES SOLD EMPTY; POUCHES FOR HOLDING MAKEUP ACCESSORIES SOLD EMPTY; MAKEUP ACCESSORY CARRYING CASES SOLD EMPTY, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).

FIRST USE 1-1-2012; IN COMMERCE 1-1-2012.

FOR: SPONGE APPLICATOR FOR APPLYING MAKEUP; SPONGES USED FOR APPLYING MAKEUP; SPONGE HOLDERS; COSMETIC STORAGE KITS INCLUDING A PALETTE EMPTY OF COSMETICS USED FOR COLOR MATCHING PURPOSES AND STORAGE OF CUSTOMIZED COSMETIC BLENDS IN A NONMETAL STORAGE CONTAINER; COSMETIC BLENDING SPONGE KITS COMPRISING SPONGES FOR APPLYING MAKEUP AND SPONGE CLEANSER; TOOLS FOR SKIN CARE, NAMELY, COSMETIC BRUSHES, IN CLASS 21 (U.S. CLS. 2, 13, 23, 29, 30, 33, 40 AND 50).

FIRST USE 7-1-2004; IN COMMERCE 7-1-2004.

OWNER OF U.S. REG. NO. 2,945,105.

THE MARK CONSISTS OF THE STYLIZED LETTERING OF THE WORD "BEAU-TYBLENDER".

SER. NO. 86-242,868, FILED 4-4-2014.

MARK SPARACINO, EXAMINING ATTORNEY

# United States of America
## United States Patent and Trademark Office

the original
**beautyblender**

**Reg. No. 4,719,170**

**Registered Apr. 14, 2015**

**Int. Cls.: 3, 18 and 21**

**TRADEMARK**

**PRINCIPAL REGISTER**



Director of the United States
Patent and Trademark Office

REA.DEEMING BEAUTY, INC. (CALIFORNIA CORPORATION), DBA BEAUTYBLENDER
SUITE 280
3864 COURTNEY STREET
BETHLEHEM, PA 18017

FOR: NON-MEDICATED CLEANSERS, NAMELY, CLEANSER FOR CLEANING COSMETIC SPONGE APPLICATORS AND MAKE UP BRUSHES, IN CLASS 3 (U.S. CLS. 1, 4, 6, 50, 51 AND 52).

FIRST USE 7-1-2005; IN COMMERCE 7-1-2005.

FOR: COSMETIC CASES SOLD EMPTY; TRAVEL CASES; VANITY CASES SOLD EMPTY; POUCHES FOR HOLDING MAKEUP ACCESSORIES SOLD EMPTY; MAKEUP ACCESSORY CARRYING CASES SOLD EMPTY, IN CLASS 18 (U.S. CLS. 1, 2, 3, 22 AND 41).

FIRST USE 1-1-2012; IN COMMERCE 1-1-2012.

FOR: SPONGE APPLICATOR FOR APPLYING MAKEUP; SPONGES USED FOR APPLYING MAKEUP; SPONGE HOLDERS; COSMETIC STORAGE KITS INCLUDING A PALETTE EMPTY OF COSMETICS USED FOR COLOR MATCHING PURPOSES AND STORAGE OF CUSTOMIZED COSMETIC BLENDS IN A NONMETAL STORAGE CONTAINER; COSMETIC BLENDING SPONGE KITS COMPRISING SPONGES FOR APPLYING MAKEUP AND SPONGE CLEANSER; TOOLS FOR SKIN CARE, NAMELY, COSMETIC BRUSHES, IN CLASS 21 (U.S. CLS. 2, 13, 23, 29, 30, 33, 40 AND 50).

FIRST USE 7-1-2004; IN COMMERCE 7-1-2004.

OWNER OF U.S. REG. NO. 2,945,105.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "ORIGINAL" , APART FROM THE MARK AS SHOWN.

THE MARK CONSISTS OF THE WORD "THE" IN CURSIVE FONT TO THE LEFT OF THE WORD "ORIGINAL" IN NONCURSIVE FONT, BOTH OF SAID WORDS POSITIONED ABOVE THE WORD "BEAUTYBLENDER" WHICH IS IN LARGER FONT. THE WORDS "ORIGINAL" AND "BEAUTYBLENDER" ARE IN THE SAME FONT.

**Reg. No. 4,719,170** SER. NO. 86-241,638, FILED 4-3-2014.

MARK SPARACINO, EXAMINING ATTORNEY

# EXHIBIT B

## Distribution Agreement

This Distribution Agreement (the "Agreement"), made and entered into as of January 1, 2018, by and between Rea.deeming Beauty, Inc., ("Company"), a corporation duly organized under the laws of the State of California U.S.A., and New Flag GMBH. ("Distributor") a corporation duly organized under the laws of **Germany.**

WHEREAS, Company manufactures and markets certain products and desires to market in territory as defined herein, such products;

WHEREAS, Distributor has represented expressed a desire and willingness to promote and market such products; and

WHEREAS, Company is willing to appoint Distributor and Distributor is willing to accept such appointment as distributor of Company's products in the territory defined herein;

NOW, THEREFORE, in consideration of the mutual premises and covenants hereinafter set forth, the parties agree as follows:

1. **DEFINITIONS.**  For purposes of this Agreement, the following terms shall have the following meanings:

    1.1. "Agreement" shall mean collectively this Distribution Agreement together with all Schedules and Exhibits hereto and the Standard Terms and Conditions affixed hereto.

    1.2. "Distributor" shall mean New Flag GMBH and its subsidiaries, parent companies, and assigns.

    1.3. "Distributor List Price" shall mean the prices in effect as of the date hereof as set forth in Exhibit A.

    1.4. "Products" shall mean any and all cosmetics, skin care, nail care, hair care, and any and all other products manufactured, offered for sale, and/or sold by Company now and in the future.  Company's current list of the Products is set forth on Exhibit A.

    1.5. "Company" will mean Rea.deeming Beauty, Inc. and its subsidiaries, parent companies, and assigns.

    1.6. "Company Information" will mean any and all confidential and/or proprietary knowledge, data or information of Company, its principals or affiliates and any and all confidential and/or proprietary knowledge, data or information which Company has obtained or obtains from another party and which Company treats as proprietary or designates (whether or not in writing) as confidential information. By way of illustration, but not limitation, "Company Information" includes tangible and intangible information relating in any way to Company's markets, customers, inventions, procedures, designs, strategies, plans, assets, liabilities, costs, revenues, profits, organization, employees, agents, distributors or business in general, the Products, ancillary or related products, web sites, methods of production and/or modifications, formulations, compilations, programs, devices, methods, techniques, processes, know-how, business relationships, contact information for industry professionals, formulas, developmental or experimental work, improvements, discoveries, potential new or supplemental or ancillary products, business plans, budgets and unpublished financial statements, licenses, prices and costs, vendors, collaborators and customers, information regarding the skills and compensation of employees and contractors of Company, trademarks, copyrights, patents, trade secrets, copyrightable material, trademarkable material, patentable material, databases and any other information or material considered proprietary by Company, designated as confidential information by Company, not generally known by the public, or which derives independent economic value (actual or potential)

from not being generally known to the public or persons unaffiliated with Company and which is subject of efforts by Company that are reasonable under the circumstances to maintain its secrecy.

1.7. "Territory" shall mean Germany, Austria, Switzerland, Czech Republic, Slovakia

## 2. APPOINTMENT

2.1. <u>Scope</u>.   Company hereby appoints Distributor, and Distributor hereby accepts appointment, as Company's distributor during the Term of this Agreement with the exclusive right to market, sell or otherwise distribute the Products in the Territory, under Company's name, logotypes, and trademarks, subject to all the terms and conditions of this Agreement.

2.2. <u>Exclusivity</u>. Subject to Distributor's satisfaction of its obligations hereunder, Company shall not grant any entity the right to market, sell, or otherwise distribute the Products in the Territory during the Term of this Agreement, whether as a distributor, agent, representative, or reseller.   Subject to Distributor's satisfaction of its obligations hereunder, Company shall not knowingly permit any other distributor of Company to directly advertise, market, sell or distribute the Products in the Territory. Company shall not knowingly allow other Company's distributors or agents to cross ship into the Territory. Company shall not ship directly to any retailer in the territory. **Sephora and Travel Retail are exceptions to the exclusivity clause and are considered house accounts. beautyblender supplies the product to these retailers direct.**

2.3. <u>Subdistributors</u>.   Distributor may appoint sub-distributors or agents to market, promote, sell and/or distribute the Products in any country within the Territory; subject to satisfaction of all of the following pre-conditions: (i) .prior to such appointment becoming effective, Distributor shall have given Company at least twenty (20) days' prior written notice, which notice shall set forth the name, address, telephone and fax number, email address and contact person for such sub-distributor or agent, as applicable, and (ii) Company shall have received a signed amendment to this agreement  by such sub-distributor or agent agreeing to be bound by the terms  of this Agreement, in form and substance satisfactory to Company.   **Company reserves the right to approve or disapprove of any sub-distributor or agent, in its sole discretion.**

2.4. <u>Sales Outside the Territory</u>.   Distributor **shall not directly ship the Products outside of the Territory or knowingly permit such activity to be conducted by any entity.**  Distributor shall not actively advertise, promote or solicit customers for the Products outside the Territory nor establish any office through which orders are solicited or any depot at which inventories of the Products are stored outside the Territory. Activities outside the designated territory are considered a **material breach of contract.**

2.5. <u>Annual Purchase Minimums</u>.  Distributor agrees to purchase a minimum amount of the Products as set forth in <u>Exhibit B</u> attached hereto and incorporated by reference herein ("Annual Purchase Minimum"), during each 12-month period ("12-Month Period. In the event of a termination of this Agreement prior to the end of a full 12-Month Period, then the Annual Purchase Minimum required to be made by Distributor shall be prorated based upon a 365 day period and the actual number of days lapsed during the shortened 12-Month Period, with the purchase amount rounded up to the nearest U.S. Dollar. In the event of termination by Company, distributor shall not be liable for outstanding balance between actual dollars purchased and Annual Purchase Minimum. Distributor will only be liable for outstanding payment of products already shipped.

## 3. PRICES AND PAYMENTS

Distributor Initials _FH_
{7653.001-666278.DOC-(1)}

2

3.1. <u>Prices</u>.  The prices to be paid by Distributor for the Products purchased pursuant to this Agreement shall be according to those reflected in EXHIBIT A. Prices are Ex Works and distributor pays for all freight costs.

3.2. <u>Price Increases, Decreases</u>.  Company may, at any time during the Term of this Agreement, change the pricing set forth on the Distributor List Prices by providing Distributor with at least ninety (90) days prior written notice.  Increased prices for any or all of the Products shall not apply to Orders placed by Distributor on or prior to the effective date of the price increase. Orders placed once the price increase has been announced cannot exceed one quarter's pro rated Annual Purchase Minimum. Price shall not increase by more than 5% per annum. Price decreases with respect to all of the Products shall be effective immediately upon written notice to the Distributor on all such Products not yet delivered.

3.3. <u>Payment Terms</u>. Payments by Distributor hereunder shall be made by credit card or wire transfer as follows: net due 45 (forty-five) days from date of invoice.

## 4.   TERM AND TERMINATION

4.1. <u>Term</u>.  This Agreement shall take effect as of the date first above written and shall continue in force for the initial period of three years (3) years ("Initial Term").  Thereafter, this Agreement shall be renewed for an additional period of three (3) year each ("Renewal Term", and together with the Initial Term, the "Term"), unless either party provides written notice to the other party of its intent to not renew this Agreement at least sixty (60) days prior to the end of the then-Initial Term or the Renewal Term, as applicable.

4.2. <u>Termination</u>.  Notwithstanding the provisions of this Section, this Agreement may be terminated in accordance with the following provisions:

(a)  Either party hereto may terminate this Agreement at any time by giving notice in writing to the other party, which notice shall be effective upon dispatch, should the other party file a petition of any type as to its bankruptcy, be declared bankrupt, become insolvent, make an assignment for the benefit of creditors, go into liquidation or receivership, or otherwise lose legal control of its business.

(b)  Either party may terminate this Agreement by giving notice in writing to the other party in the event the other party is in material breach of this Agreement and shall have failed to cure such breach within thirty (30) days of receipt of written notice thereof from the first party;

(c)  Company may terminate this Agreement at any time on written notice within ninety (90) days if Distributor shall have failed to meet the Annual Purchase Minimum applicable to such period (prorated for any period shorter than a 12-Month Period) as set forth in this Agreement. Should the Annual minimum purchase Minimum not be met, distributor has 90 days  (cure phase) to rectify the situation and submit orders to satisfy the Annual Purchase Minimum. These purchases will not be applicable to the following year's Annual Purchase Minimum.

(d)  Company may terminate this Agreement at any time on written notice in the event that the Distributor: (i) merges with any company or other entity, (ii) assigns or disposes of substantially all of its assets or business to any third party. Distributor will have 6 months to sell-off balance of inventory at Full MSRP or the company may choose to buy back the inventory at the price initially paid.

Distributor Initials _FH_
{7653.001-666278.DOC-(1)}

3

4.3. <u>Rights and Obligations on Termination</u>.  In the event of termination of this Agreement for any reason, the parties shall have the following rights and obligations:

(a) Termination of this Agreement shall not release either party from the obligation to make payment of all amounts then or thereafter due and payable, nor shall it relieve any party from its indemnification obligations hereunder.

(b) Company shall have the right, at its option, to (i) cancel any or all accepted purchase orders which provide for delivery after the effective date of termination, and/or (ii) repurchase any part of Distributor's inventory of the Products in Distributor's possession as of the termination date at Company's invoiced price to Distributor for such products, less depreciation calculated on a thirty-six (36) month, straight-line basis and less any appropriate amount for excessive wear and tear, plus freight to the original FOB shipping point.  Company shall exercise its option under this subsection by notifying Distributor in writing no later than thirty (30) days after the effective termination date.

(c) Distributor's confidentiality obligations shall survive termination of this Agreement.

(d) Distributor shall, on its own responsibility, collect and remove all data, signboards, posters, and advertising relating to the Products, and shall, at its sole expense, deliver to Company or dispose of a part or the whole of them in accordance with Company's instructions.

(e) Distributor shall remove and discontinue using Company's trade name, trademarks and any marks confusingly similar thereto.

(f) Distributor shall not conduct itself, whether intentionally or not, in such a manner as would lead a third party to believe that Distributor is still an authorized distributor of the Products.

4.4. <u>No Compensation</u>.  In the event either party terminates this Agreement for any reason in accordance with the terms hereof, the parties hereby agree that, except as otherwise specifically provided in this Agreement and without prejudice to any other remedies which either party may have in respect of any breach of this Agreement, neither party shall be entitled to any compensation or like payment from the other as a result of such termination.

**5.** <u>TERMS AND CONDITIONS</u>. The Terms and Conditions referenced herein and attached to this Agreement are an integral part of this Agreement and are incorporated by reference herein. In the event of any conflict or inconsistency between the terms of Sections 1 through 5 herein and the Terms and Conditions, the Terms and Conditions shall control.

**6.  MISCELLANEOUS**

6.1. <u>Governing Law and Venue</u>.  This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of California, USA, without regard to its conflict of laws principles.  Each party irrevocably consents to jurisdiction and venue in Los Angeles County, California and irrevocably waives any objection to improper jurisdiction, improper venue or inconvenient forum in Los Angeles County, California.  The parties specifically exclude from application to this Agreement that law known as the United Nations Convention on the International Sale of Goods.

6.2. <u>Relationship</u>.  This Agreement does not make either party the employee, agent or partner of the other for any purpose whatsoever.  Other than between the parties as specifically set forth in this

Distributor Initials  _____
{7653.001-666278.DOC-(1)}

4

Agreement, neither party is granted any right or authority to assume or to create any obligation or responsibility, express or implied, on behalf of or in the name of the other party.

6.3. <u>Assignment</u>.   Neither party shall have the right to assign or otherwise transfer its rights and obligations under this Agreement except with the prior written consent of the other party, which will not be unreasonably withheld.   Company shall be entitled to assign any or all of its rights and obligations hereunder to any of its subsidiaries or a successor in interest by merger, by operation of law, assignment, purchase or otherwise of its entire business.  Any prohibited assignment shall be null and void.

6.4. <u>Notices</u>.   Notices permitted or required to be given hereunder shall be deemed sufficient if given personally, by facsimile (with evidence of receipt) or by reputable courier service (with evidence of delivery), addressed to the respective addresses of the parties as first above written or at such other addresses as the respective parties may designate by like notice from time to time.  Notices so given shall be effective upon delivery or receipt by the party to which notice is given.

6.5. <u>Entire Agreement</u>.   This agreement, and all exhibits attached hereto, constitute the entire agreement of the parties with respect to the subject matter hereof, and supersedes all previous agreements, oral or written, by and between Company and distributor parties related to this agreement.  Distributor and Company each individually acknowledge that it has not been induced to enter into this agreement by any representations or statements, oral or written, not expressly contained herein.

6.6. <u>Amendment</u>.   This Agreement shall not be deemed or construed to be modified, amended, rescinded, cancelled or waived, in whole or in part, except by written amendment signed by the parties hereto.

6.7. <u>Publicity</u>.   This Agreement is confidential and no party shall issue press releases or engage in other types of publicity of any nature dealing with the commercial and legal details of this Agreement without the other party's prior written approval, which approval shall not be unreasonably withheld. However, approval of such disclosure shall be deemed to be given to the extent such disclosure is required to comply with governmental rules, regulations or other governmental requirements.  In such event, the publishing party shall furnish a copy of such disclosure to the other party.

6.8. <u>Severability</u>.  In the event that any of the terms of this Agreement are in conflict with any rule of law or statutory provision or are otherwise unenforceable under the laws or regulations of any government or subdivision thereof, such terms shall be deemed stricken from this Agreement, but such invalidity or unenforceability shall not invalidate any of the other terms of this Agreement and this Agreement shall continue in force, unless the invalidity or unenforceability of any such provisions hereof does substantial violence to, or where the invalid or unenforceable provisions comprise an integral part of, or are otherwise inseparable from, the remainder of this Agreement.

6.9. <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, including by facsimile or email with PDF attachment, in the English language, and each such counterpart shall be deemed an original hereof.  In case of any conflict between the English version and any translated version of this Agreement, the English version shall govern.

6.10. <u>Further Assurances</u>.  The parties hereto each agree to execute, make, acknowledge, and deliver such instruments, agreements and other documents and take such actions as may be reasonably required to effectuate the purposes of this Agreement and to consummate the transactions contemplated.

6.11. <u>Attorneys Fees</u>.   If any judicial or other proceeding is brought by either party regarding the interpretation or enforcement of this Agreement, the prevailing party will recover from the other all costs, attorneys' fees and other expenses incurred by the prevailing party with regard to that

Distributor Initials _FH_
{7653.001-666278.DOC-(1)}                                                5

proceeding, and the right to such costs, attorneys' fees and other expenses shall be deemed to have accrued upon the commencement of said proceeding and shall be enforceable whether or not said proceeding is prosecuted to judgment.

6.12. <u>Waiver</u>.  No failure by either party to take any action or assert any right hereunder shall be deemed to be a waiver of such right in the event of the continuation or repetition of the circumstances giving rise to such right.

6.13. <u>Force Majeure</u>.  Nonperformance of either party will be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts or orders or restrictions, or other similar reason where failure to perform is beyond the control and not caused by the negligence of the non-performing party, provided that the non-performing party gives prompt notice of such conditions to the other party and makes all reasonable efforts to perform.

## 7.   **OBLIGATIONS OF DISTRIBUTOR**.

7.1. <u>Annual Marketing Plan</u>.  On or before June 30 of each calendar year this Agreement is in effect, Rea.deeming Beauty and Distributor shall agree to an Annual Marketing Plan for the sale of the Products in the next calendar year.  Both parties (Company and Distributor) agree to meet on an annual basis. The Annual Marketing Plan shall set forth Distributor's sales, marketing and distribution plans, as well as a description of planned promotion and trade spending activities.  Included within this Annual Marketing Plan shall be a forecast of quarterly unit and dollar purchases on a by item basis.  It is understood that this forecast shall be updated quarterly or more frequently as needed.

7.2. <u>Monthly report</u> On or before the 20th of each month Distributor shall submit updated "Distribution file" to both the Director of Sales, EMEA and VP of Global sales. This shall include new distribution opportunities with major retail costumers to be discussed and approved by Rea.deeming Beauty Inc.

7.3. <u>Report every 6 months</u>.  Within 15 days after the last day of each calendar quarter this Agreement is in effect, Distributor shall submit to Rea.deeming Beauty a Quarterly Report specifying in detail: (a) the number of cases of the Products sold during the previous quarter listed by SKU; (b) the advertising, promotion and trade spending activities and expenditures with respect to the Products during the previous quarter; (c) the number of cases, listed by SKU, forecasted to be sold during the next quarter; (d) Distributor's current price list for the Products; and (e) any other relevant information the Distributor deems to be valuable such as competitive activity in the Territory.

7.4. <u>Retail Prices of Products</u>.  Distributor shall notify Rea.deeming Beauty of the retail pricing for all Products (outlined in <u>Exhibit 1</u>) and inform Rea.deeming Beauty promptly of any change in pricing.

7.5. <u>Local Law</u>.  Distributor shall notify Rea.deeming Beauty of the existence and content of any provision of law in the Territory, or any other applicable law, that conflicts with any provision of this Agreement at the time of its execution or thereafter.  In addition, Distributor shall notify Rea.deeming Beauty if any of the Products require registration or other authorization with any governmental body in the Territory before being sold in the Territory.

7.6. <u>Labeling and Other Legal Requirements</u>.  Distributor shall advise Rea.deeming Beauty of all labeling and other legal requirements imposed by law in the Territory that are applicable to the import, sale or distribution of the Products.  Distributor also shall use all reasonable efforts to ensure Products comply with all such legal requirements prior to their sale in the Territory.

Distributor Initials   _FH_

{7653.001-666278.DOC-(1)}                                              6

7.7. <u>Proof of Export to the Territory</u>.  Where Rea.deeming Beauty is not shipping the Products or is not otherwise the "Shipper of Record," Distributor shall be able to provide to Rea.deeming Beauty copies of the "Ocean Carrier's Bills of Lading" and the Distributor's Non-Vessel Operated Common Carrier's (or NVOCC) Bills of Lading (where applicable) within 30 days after the date of Readeeming Beauty invoice.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed on the date first above written.

"Company"
REA.DEEMING BEAUTY, INC.

By: _____     Witness_____

JEFFREY HOLLAND
EXECUTIVE VICE PRESIDENT, GLOBAL SALES

"Distributor"
New Flag GMBH

By: _____     Witness _Xaura Heine_

FELIX                                 Brandmanagement

MANAGING    PARTNER

Distributor Initials _F.H_
{7653.001-666278.DOC-(1)}                    7

**Exhibit A (excel file attached)**

Distributor Initials _____
{7653.001-666278.DOC-(1)}

**EXHIBIT B**

**Annual Purchase Minimum Requirements**
**(Based on Distributor Cost)**

For the territories of Germany, Switzerland, and Austria

January 1, 2018 – December 31, 2018:  $1,300,000 USD
January 1, 2019 – December 31, 2019: $1,500,000 USD
January 1, 2020 – December 31, 2020: $1,800,000 USD

For the territories of Czech Republic and Slovakia

January 1, 2018 – December 31, 2018:  $170,000 USD
January 1, 2019 – December 31, 2019: $195,000 USD
January 1, 2020 – December 31, 2020: $220,000 USD

Distributor Initials _FH_____
{7653.001-666278.DOC-(1)}

## <u>EXHIBIT C</u>

## Company Trademarks



**blendercleanser®**

Modernize the Way You Make Up®

®



**Standard Terms and Conditions**

I. **GENERAL OBLIGATIONS OF DISTRIBUTOR.**

1. **Marketing.** Distributor shall have the following obligations with respect to the marketing, sale and distribution of the Products:

(a) To use its reasonable best efforts to promote, market, distribute and promote the sale of the Products in the Territory during the Term hereof; (b) To promptly respond to all inquiries from customers, including complaints, process all orders, and effect all shipments of the Products; (c) To permit Company, with reasonable advance notice and during regular business hours, visit Distributor's places of business and inspect its inventories, service records, sales records, and other relevant documents; (d) To conduct business in a manner that reflects favorably at all times on the Products and on Company's goodwill and reputation; (e) To make no false or misleading representations with regard to the Products; and (f) To utilize the Products only as authorized under this Agreement and not directly or indirectly use, permit the use or cause the use of such Products in any other manner, including, but not limited to, the development of any products or services that are competitive with those of Company

2. **Advertising.** Distributor may utilize advertising materials provided by Company to promote sales of the Products and to prepare its own advertising materials, to the extent so desired, subject to Company's prior reasonable approval. All expenses incurred by Distributor with respect to creating its own materials for advertising the Products in the Territory shall be borne by Distributor; and (b) Distributor shall dispatch any advertising/PR or other promotional material to Company for

Company's archives and to have knowledge of material content, and shall provide Company with written updates regarding success, progress or concerns within the Territory on a quarterly basis.

3. **Manufacture or Distribution of Competitive Goods.** During the Term of this Agreement, and for an additional two (2) years thereafter if Distributor is the party that breaches this Agreement or initiates termination of this Agreement, Distributor shall not manufacture or distribute any products which are directly competitive with the Products (i.e make-up sponge) as reasonably determined by Company. Products are to be distributed within the market level as communicated by Company to Distributor, from time to time. Notwithstanding any other provision to the contrary, Distributor may sell or otherwise distribute other products relating to make up, skin care, nail care and hair care.

4. **Non-Solicitation.** During the Term of this Agreement, and for an additional one (1) year thereafter, Distributor shall not, directly or indirectly, solicit: (a) Company's vendors, suppliers or customers to do business with any entity or person other than Company relative to the Products, or (b) any of Company's employees or independent contractors to work for a person or entity other than Company. Distributor shall not hire or retain any employee who has left the employment or any contractor who has left the consultancy of Company if such hiring is proposed to occur within one (1) year after the termination of such employee's employment or contractor's consultancy with Company.

5. **Non-Circumvention.** Distributor covenants and warrants to Company that Distributor shall not engage in any action or activity that would

Standard Terms and Conditions
Page 2
{7653.001-666278.DOC-(1)}

result in the circumvention of purposes of this Agreement or Distributor's obligations under this Agreement.

**6. Insurance.** Distributor shall maintain adequate product liability and other appropriate insurance acceptable to Company, to protect itself from claims which may arise as a result of damage to the Products while in the possession or control of the Distributor.

## II. GENERAL OBLIGATIONS OF COMPANY

**1. Marketing Materials.** Company shall furnish Distributor with a reasonable quantity of Company's marketing materials including, catalogs, brochures, product samples and other sales aids that may be available to Company.

**2. Technical Support.** Company shall provide Distributor with reasonable technical support regarding the Products and use thereof. Company requires Distributor to devote the time as necessary for adequate training to ensure proper use and technique of Products.

**3. Expenses.** Company shall pay all travel expenses for its representatives to travel to the Territory for participation in marketing, advertising events, training and inspections, if and to the extent mutually agreed by Company and Distributor.

**4. Company Participation.** The parties will mutually agree on the extent of participation of Company and its representatives in the marketing and advertising of the Products.

**5. Non-Circumvention.** Subject to Distributor's satisfaction of its obligations hereunder, Company shall not engage in any action or activity that would result in the circumvention of purposes of this Agreement or Company's obligations under this Agreement.

## III. ORDERS FOR THE PRODUCTS.

**1. Order Information.** Distributor shall submit purchase orders ("Orders") for the Products to Company in writing that shall set forth:

(a) Identification of the Products ordered, including model numbers, date of order, and pricing (as set forth in the applicable Distributor List Price); (b) Quantity; (c) Requested fulfillment date; and (d) Shipping address.

**2. Order Process.** Orders shall be processed as follows:

(a) Orders must be received by Company at least thirty (30) days prior to the fulfillment dates requested. (b) Company shall provide Distributor with written notice of acceptance or rejection with good cause within ten (10) business days from the date of receipt of such orders (the "Notice"); (c) The Notice may be delivered either by hand-delivery, email with read-receipt confirmation, facsimile with confirmation, or mail with receipt; and (d) Each Order shall be deemed to be an offer by Distributor to purchase the Products pursuant to the terms of this Agreement and, when accepted by Company, shall give rise to a contract under the terms set forth herein; and (e) To the extent the Order conflicts with any terms in this Agreement, the terms of this Agreement shall govern.

**3. Modification of Orders.** Orders accepted by Company as provided herein may not be modified or cancelled without the prior written agreement of both parties. All Orders or mutually agreed change orders shall be subject to the terms of this Agreement. No terms in any Order(s) shall amend, modify or otherwise change these Terms and Conditions, unless expressly agreed upon in writing by Company.

**4. Product Changes.** Company reserves the right, in its sole discretion and without incurring any liability to Distributor, to: (a) Alter the specifications for any Product;(b) Discontinue the manufacture of any Product;(c) Discontinue the development of any new product, whether or not such product has been announced publicly; or (d) Commence the manufacture and sale of new products having features which make any Product wholly or partially obsolete.

**5. Product Acceptance and Provision.** Notwithstanding the foregoing, once an Order has been accepted by Company as provided herein, Company shall fulfill the Order as

requested and as accepted, unless otherwise mutually agreed to in writing by the parties.

## IV. DELIVERY OF THE PRODUCTS.

**1. Ex Works.** All deliveries of the Products shall be Ex Works at Company's manufacturing or warehouse facilities.

**2. Transfer of Title.** Company shall have no further responsibility for the Products and title and all risk of damage to or loss or delay of the Products shall pass to Distributor upon the delivery of the Products at the FOB delivery point which shall be either (a) a common carrier, or (b) an agent, or (c) any other person specified by Distributor acting on behalf of Distributor.

**3. Insurance.** Distributor shall insure each shipment of Products with a reputable insurer. Such insurance shall provide for full coverage of the Distributor's cost of the Products from the time the Products are delivered at the FOB point until Distributor shall have paid Company for such Products in full. Company reserves all rights with respect to delivered Products permitted by law including, without limitation, the rights of rescission, repossession, resale, and stoppage in transit until the full amount due from Distributor in respect of all delivered Products has been paid.

## V. ACCEPTANCE.

**1. Acceptance of the Products.** Company shall not be liable for Product defects and/or such shortage, damage or discrepancy in or to a shipment of the Products unless Company has received notice and substantiating evidence thereof from Distributor within thirty (30) days of arrival of the Products at Distributor's shipping address in the Territory. If the substantiating evidence delivered by Distributor demonstrates that Company is responsible for such Product defects and/or shortage, damage or discrepancy, Company shall promptly deliver additional or substitute Products to Distributor in accordance with the delivery procedures set forth herein at Company's expense. Company shall reimburse or credit Distributor for all shipment costs and import taxes borne by Distributor in connection with the additional or substitute Products.

**2. Notice.** Warranty claims hereunder must be made promptly and in writing; must recite the nature and details of the claim, the date the cause of the claim was first observed and the serial number of the Product concerned; and must be received by Company no later than fifteen (15) days after the expiration of the warranty period provided for in this Section.

**3. Excluded Claims.** Company shall have no obligation under this Section in the event that repair or replacement of the Products shall have been required through normal wear and tear or by the fault or negligence of Distributor or its customers.

## VI. REPRESENTATIONS, COVENANTS AND WARRANTIES.

**1. Mutual Representations and Warranties.** Each Party represents and warrants to the other Party that it is not a party to any restrictions, agreements or understandings which would prevent or make unlawful such Party's acceptance of the terms set forth in this Agreement or such Party's performance hereunder. Each Party further represents that its acceptance of the terms of this Agreement and the performance of its obligations hereunder does not and will not (with or without the passage of time) conflict with or constitute a breach or default of any contract, agreement or understanding, oral or written, to which such Party is a party or by which such Party is bound. Company and Distributor further warrant to each other that each has the right and authority to enter into this Agreement, to perform all of its respective obligations hereunder and to transfer and grant the rights transferred and granted herein. The persons executing this Agreement on behalf of Company and Distributor further represent and warrant that they have the authority from their respective governing bodies to enter into this Agreement and to bind their respective companies or entities or personality to all the terms and conditions of this Agreement.

**2. Company's Representations and Warranties.** Company represents and warrants to Distributor that Company has good and marketable title to the Products delivered to



Distributor in fulfillment of each Order accepted by Company under this Agreement.

**3.  Product Warranty.** Company warrants for a period of one (1) year after the date of delivery of the Products in accordance with this Section that the Products shall be free from defects in material, content and workmanship.  This limited warranty does not cover defects occurring after purchase due to intentional damage, misuse, abuse or negligence, modification or accidental damage, acts of violence and acts of Nature.  Company's sole obligation in the event of a breach of such warranty shall be to provide, at no charge to Distributor, replacement parts for all defective parts as set forth in this Agreement.

**4.  Limited Warranty.** THE WARRANTIES SET FORTH IN THIS SECTION ARE INTENDED SOLELY FOR THE BENEFIT OF DISTRIBUTOR.  ALL CLAIMS HEREUNDER SHALL BE MADE BY DISTRIBUTOR AND MAY NOT BE MADE BY DISTRIBUTOR'S CUSTOMERS. IN NO EVENT WILL COMPANY HAVE ANY RESPONSIBILITY OR BEAR ANY LIABILITY FOR THE COST OF LABOR FOR THE REPAIR OR REMOVAL OF ANY DEFECTIVE PRODUCTS.  THE WARRANTIES SET FORTH ABOVE ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, WHICH ARE HEREBY DISCLAIMED AND EXCLUDED BY COMPANY, INCLUDING WITHOUT LIMITATION ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT. ANY PRODUCT LIABILITY ISSUES WILL BE HANDLED BY THE COMPANY.

## VII.  LIMITATION OF REMEDIES AND INDEMNIFICATION.

**1.  Sole Remedies.** IN NO EVENT SHALL COMPANY'S LIABILITY FOR ANY BREACH ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE WHOLESALE COST TO DISTRIBUTOR'S CUSTOMER(S) FOR THE ORDERS AFFECTED BY SUCH BREACH.

**2.  Consequential Damages.** IN NO EVENT SHALL COMPANY'S LIABILITY OF ANY KIND INCLUDE ANY LIQUIDATED, SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL LOSSES OR DAMAGES, EVEN IF COMPANY SHALL HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE.  IN NO EVENT WILL COMPANY HAVE ANY RESPONSIBILITY OR BEAR ANY LIABILITY FOR THE COST OF LABOR FOR THE REPAIR OR REMOVAL OF ANY DEFECTIVE PRODUCTS.

**3.  Distributor's Indemnification.** Distributor shall indemnify Company, and its directors, officers, employees and agents, and defend and hold each of them harmless from and against any and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) arising out of: (a) damage to the Products while in the possession or control of Distributor to the extent not covered by the insurance procured pursuant to Section 3.6; (b) any damage to persons or property resulting from the handling or distribution of the Products by Distributor, its employees, agents, servants, successors and assigns in breach or violation of any written instructions or training ; received from Company with respect to the Products; (c) any and all liability and damages for personal injury and property damage arising out of or related to the performance of this Agreement by Distributor, its employees, agents, successors and assigns, including, without limitation, based upon a warranty, express or implied, extended by Distributor which deviates from or is in conflict with Company's limited warranty provided herein; or (e) Distributor's breach of any provision of this Agreement.

**4. Company's Indemnification.** Company shall indemnify Distributor, and its directors, officers, employees and agents, and defend and hold each of them harmless from and against any and all losses, damages, liabilities, costs and expenses (including reasonable attorneys' fees and expenses) arising out of: (a) damages for personal injury, death or tangible property damage arising from the recklessness or willful misconduct of Company, its employees, agents, servants, successors and assigns, or (b) latent defects in the Products.

## VIII. CONFIDENTIALITY.

Distributor acknowledges and agrees that all Company Information is confidential and proprietary to Company. Distributor agrees not to use any of such Company Information during the term of this Agreement and for a period of two (2) years thereafter for any purpose other than as permitted or required for performance by Distributor hereunder. Distributor agrees not to disclose or provide any of such Company Information to any third party, and shall only permit those employees who need to use such Company information for Distributor's performance of its obligations under this Agreement. Nothing herein shall prevent Distributor from using, disclosing or authorizing the disclosure of any Company Information which is, or hereafter becomes, part of the public domain. Distributor understands and acknowledges that the Company Information has been developed or obtained by Company by the investment of significant time, effort and expense and provides the Company with a significant competitive advantage in its business. Distributor understands and acknowledges that Company's customer, employee and consultant relationships have been developed or obtained by Company by the investment of significant time, effort and expense and provides Company with a significant competitive advantage in its business. If Distributor fails to comply with any obligations set forth in this Paragraph 11, Company will suffer immediate, irreparable harm for which monetary damages will provide inadequate compensation. Accordingly, the parties agree that Company will be entitled, in addition to any other remedies available to it, at law or in equity, to injunctive relief to specifically enforce the terms of this Agreement.

## IX. TRADEMARKS.

**1. Use of Trademarks.** Company hereby grants to Distributor a non-exclusive, non-transferable, and royalty-free right and license to use the Company trademarks specified in Exhibit C ("Trademarks"), as such Exhibit may be modified from time to time during the term of this Agreement, in connection with the sale or other distribution, promotion, advertising and maintenance of the Products for so long as such trademarks are used by Distributor in accordance with Company's standards, specifications and instructions, but in no event beyond the term of this Agreement. Distributor shall submit all uses of the Trademarks to Company for approval or rejection, prior to any uses of the Trademarks. Distributor shall not use any material incorporating or using Trademarks without approval from Company. Distributor shall acquire no right, title or interest in such Trademarks other than the foregoing limited license, and Distributor shall not use any Trademarks as part of Distributor's corporate or trade name or permit any third party to do so without the prior written consent of Company.

**2. Markings.** Distributor shall not, without the prior written consent of Company, remove or alter any patent numbers, trade names, trademarks, notices, serial numbers, labels, tags or other identifying marks, symbols or legends affixed to any of the Products or containers or packages.

**3. Infringements.** If discovered by Distributor, it shall promptly notify Company of any use by any third party of the Trademarks or any use by such third parties of similar marks which may constitute an infringement or passing off of the Trademarks. Company reserves the right in its sole discretion to institute any proceedings against such third party infringers and Distributor shall refrain from doing so. Distributor agrees to cooperate fully with Company in any action taken by Company against such third parties, provided that all expenses of such action shall be borne by Company and all damages which may be

awarded or agreed upon in settlement of such action shall accrue to Company.

**4. Termination of Use.** Distributor acknowledges Company's proprietary rights in and to the Trademarks and any trade names regularly applied by Company to the Products, and Distributor hereby waives in favor of Company all rights to any trademarks, tradenames and logotypes now or hereafter originated by Company. Distributor shall not adopt, use or register any words, phrases or symbols which are identical to or confusingly similar to any of Company's trademarks. Upon termination of this Agreement, Distributor shall cease and desist from use of the Company trademarks in any manner.

## X. TAXES

**1. Taxes and Duties.** Distributor shall be solely responsible for and shall pay, or reimburse Company for, all taxes, duties, import deposits, assessments and other governmental charges, however designated, which are now or hereafter imposed under or by any governmental authority or agency ("Charges"), that are (a) associated with the performance by Company of its obligations hereunder, (b) associated with the payment of any amount by Distributor to Company pursuant to this Agreement, (c) based on the Products or their use, or (d) relate to the import of the Products into the Territory in accordance with then prevailing law or regulations. Notwithstanding the foregoing, Distributor shall only be liable for such Charges that are imposed after title to the Products has transferred from Company to Distributor, and under no circumstances shall Distributor be liable for charges Company incurs while title to the Products remains in Company.

**2. Net Amounts.** All payments to be made by Distributor to Company pursuant to this Agreement represent net amounts Company is entitled to receive and shall not be subject to any deductions or offsets for any reason whatsoever. In the event any of said payments become subject to Charges that are levied outside the United States, and such Charges have not been paid, then payments to Company shall be increased to such an extent as to allow Company

to pay such Charges and receive the net amounts due under this Agreement.

## XI. IMPORT AND EXPORT OF THE PRODUCTS

**1. Import Documentation.** Distributor shall be responsible for obtaining all licenses and permits and for satisfying all formalities as may be required to import the Products into the Territory in accordance with then prevailing law or regulations.

**2. Export Regulations.** Distributor shall supply Company on a timely basis with all necessary information and documentation reasonably requested by Company in order to permit Company to export the Products with respect to any sale or order solicited by Distributor hereunder. Distributor shall not dispose of any of the Products, know-how, technical data, documentation or other products or materials furnished to Distributor by Company pursuant to this Agreement to any party or in any manner which would constitute a violation of the export control regulations of the United States now or hereafter in effect if the disposition was made by a U.S. corporation, or a non-U.S. corporation subject to those regulations.

## XII. DISPUTES.

Any dispute, controversy or claim arising out of or relating to this Agreement shall be finally settled by binding arbitration before a single neutral arbitrator in Los Angeles County, California, in accordance with the JAMS/Endispute Rules and Procedures, which shall specifically include the right to discovery and the rules of evidence set forth in the California Evidence Code, and in conjunction with the applicable law governing this Agreement. In the event that Company and Distributor cannot mutually agree upon the arbitrator, the then presiding judge of the Superior Court of the State of California located in the County of Los Angeles shall appoint the arbitrator. Except as set forth above, this arbitration includes all claims whether arising in tort or contract and whether arising under statute or common law. The arbitrator shall issue a

written finding of fact and conclusions of law, which may be enforced in any court of competent jurisdiction. The arbitrator shall have the authority to grant all monetary or equitable relief, including, without limitation, costs to the prevailing party where authorized by law. The fees of the arbitrator and all other costs that are unique to arbitration shall be paid by Company if required in order to make this arbitration provision enforceable, otherwise they shall be split equally between the parties. The arbitration shall be conducted in the English language.

XIII.   **MISCELLANEOUS.**

1.   **Force Majeure.**   Nonperformance of either party will be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts or orders or restrictions, or other similar reason where failure to perform is beyond the control and not caused by the negligence of the non-performing party, provided that the non-performing party gives prompt notice of such conditions to the other party and makes all reasonable efforts to perform.